## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **FERLIN L. COOKE,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:19cv00004 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I.  Background and Standard of Review

Plaintiff, Ferlin L. Cooke, ("Cooke"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is automatically substituted as the defendant in this case pursuant to Fed. R. Civ. P. Rule 25(d).

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cooke protectively filed his application for DIB on June 17, 2015, alleging disability as of March 14, 2015, based on back, neck and bilateral knee, shoulder and hand problems; tension headaches; scoliosis and herniated discs; balance problems; bone spurs in the back; high cholesterol; anxiety attacks; depression; and bipolar disorder. (Record, ("R."), at 12, 166-67, 187, 206, 216.) The claim was denied initially and upon reconsideration. (R. at 81-83, 87-89, 93-96, 98-100.) Cooke then requested a hearing before an administrative law judge, ("ALJ"). (R. at 101-02.) The ALJ held a hearing on January 17, 2018, at which Cooke was represented by counsel. (R. at 28-53.)

By decision dated April 9, 2018, the ALJ denied Cooke's claim. (R. at 12-22.) The ALJ found that Cooke met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 14.) The ALJ found that Cooke had not engaged in substantial gainful activity since March 14, 2015, the alleged onset date.[2] (R. at 14.) The ALJ determined that Cooke had severe impairments, namely degenerative disc disease and spine disorder, but he found that Cooke did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-16.) The ALJ found that Cooke had the residual functional capacity to perform light[3] work that required no more than frequent

---

[2] Therefore, Cooke must show that he was disabled between March 14, 2015, the alleged onset date, and April 9, 2018, the date of the ALJ's decision, in order to be eligible for benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent

balancing and that required no more than occasional stooping, kneeling, crouching, crawling and climbing. (R. at 16.) The ALJ found that Cooke was unable to perform his past relevant work. (R. at 20.) Based on Cooke's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Cooke could perform, including the jobs of a routing clerk, a photocopy machine operator and a product assembler. (R. at 21-22.) Thus, the ALJ concluded that Cooke was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Cooke pursued his administrative appeals, (R. at 160, 248-51), but the Appeals Council denied his request for review. (R. at 1-5.) Cooke then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Cooke's motion for summary judgment filed July 3, 2019, and the Commissioner's motion for summary judgment filed August 26, 2019.

## II. Facts[4]

Cooke was born in 1963, (R. at 31, 166), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). He has an eleventh-grade education and past work experience as a truck driver and a front-end loader operator. (R. at 32, 48, 188-89.)

---

lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

[4] Based on the court's findings regarding Cooke's argument that the ALJ erred by failing to find that he suffered from a severe mental impairment, the court will focus on the facts related to Cooke's mental impairments and accompanying limitations.

Cooke stated that he stayed depressed, that he was easily aggravated and that he had difficulty being around crowds. (R. at 44.) He stated that he was being treated for depression by Dr. Uzma Ehtesham, but he stopped seeing her because he did not feel comfortable talking to her about his problems. (R. at 44.) Cooke stated that his medications made him drowsy and made it difficult for him to stay focused. (R. at 46.)

David Vandergoot, a vocational expert, also was present and testified at Cooke's hearing. (R. at 47-51, 237.) Vandergoot testified that a hypothetical individual of Cooke's age, education and work history, who had the residual functional capacity to perform light work, who could occasionally climb, stoop, kneel, crouch and crawl and frequently balance, could not perform Cooke's past work. (R. at 49.) He stated that such an individual could perform work that existed in significant numbers, including jobs as a routing clerk, a photocopy machine operator and a production assembler. (R. at 49.) Vandergoot then was asked to consider the same hypothetical individual, but who would be limited to sedentary[5] work and who would be absent from work more than twice a month. (R. at 49.) He stated that there would be no jobs that such an individual could perform. (R. at 49-50.) Vandergoot also stated that there would be no jobs available if hypothetical individual number one had to avoid concentrated exposure to vibration and if he could not sit and/or stand for more than 15 minutes at a time. (R. at 50.) Vandergoot also stated that there would be no jobs available should an individual be off task greater than 10 percent of the workday. (R. at 51.)

---

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2019).

In rendering his decision, the ALJ reviewed medical records from Joseph Leizer, Ph.D., a state agency psychologist; Dr. Donald Williams, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Luc Vinh, M.D., a state agency physician; Norton Community Hospital; Mountain States Rehabilitation; Dr. Uzma Ehtesham, M.D.; Park Avenue Medical Associates; Appalachian Orthopaedic Associates, P.C.; Mountain View Regional Medical Center; Highlands Neurosurgery, P.C.; Appalachia Family Health; and Melinda M. Fields, Ph.D., a licensed psychologist.

Treatment notes from Dr. Vijay Kumar, M.D., a physician with Park Avenue Medical Associates, from July 2013 through October 2017 show that Cooke was diagnosed with hypertension; hyperlipidemia; unspecified alcohol dependency;[6] generalized anxiety disorder; generalized osteoarthrosis; displacement of lumbar intervertebral disc without myelopathy; and displacement of cervical intervertebral disc without myelopathy. (R. at 313.) On May 4, 2015, Cooke saw Dr. Kumar for hypertension; chronic low back pain; heartburn; and uncontrolled anxiety associated with panic attacks. (R. at 319-20.) Dr. Kumar noted stress management as part of Cooke's treatment plan. (R. at 435.) On June 2, 2015, Cooke complained of leg cramps; low back pain; anxiety and depression. (R. at 317-18.) Dr. Kumar diagnosed generalized anxiety disorder; displacement of cervical intervertebral disc without myelopathy; hypertension; and generalized osteoarthrosis, and he referred Cooke for psychotherapy counseling. (R. at 318.) Dr. Kumar also noted stress management as part of Cooke's treatment plan. (R. at 318.) On June 25, 2015, Cooke continued to complain of anxiety and depression. (R. at 432.) Dr. Kumar noted stress management and behavioral health counseling as part of

---

[6] On one occasion, Cooke reported that he consumed a six pack of beer per day. (R. at 316.) On other occasions, he reported that he consumed a six pack of beer per week. (R. at 319, 324.)

Cooke's treatment plan. (R. at 433.)

On August 6, 2015, Dr. Kumar completed a mental assessment, indicating that Cooke had no limitations on his ability to maintain personal appearance. (R. at 386-88.) He found that Cooke had a satisfactory ability to follow work rules; to use judgment in public; to understand, remember and carry out simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 386-87.) Dr. Kumar opined that Cooke had a seriously limited ability to relate to co-workers; to deal with the public; to interact with supervisors; to deal with work stresses; to function independently; and to understand, remember and carry out complex and detailed job instructions. (R. at 386-87.) He also found that Cooke had no useful ability to maintain attention and concentration. (R. at 386.) Dr. Kumar reported that Cooke could manage benefits in his own interests and that he would be absent from work more than two days a month. (R. at 388.)

On August 21, 2015, Dr. Uzma Ehtesham, M.D., a psychiatrist, saw Cooke for his complaints of depression, anxiety and panic attacks. (R. at 407-08.) Dr. Ehtesham reported that Cooke had a normal gait; his hygiene and grooming were fair; he had intermittent eye contact; his speech was spontaneous; he had normal motor activity; his affect was hypomanic, anxious and agitated with a congruent mood; his judgment and insight were fair; his reality testing was impaired; and his thought process was goal-oriented. (R. at 408.) She diagnosed bipolar I disorder, unspecified. (R. at 408.)

On September 9, 2015, Cooke saw Dr. Kumar for complaints of back and knee pain and anxiety. (R. at 413.) Dr. Kumar recommended that Cooke consider behavioral health counseling for stress reduction. (R. at 414.)

Also, on September 9, 2015, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), indicating that Cooke suffered from a nonsevere anxiety disorder. (R. at 59-60.) He found that Cooke had no restrictions on his activities of daily living; he had mild difficulties in maintaining social functioning; he had no difficulties in maintaining concentration, persistence or pace; and he had experienced no repeated episodes of extended-duration decompensation. (R. at 59.)

On September 21, 2015, Cooke reported to Dr. Ehtesham that he felt like he had a "hangover effect." (R. at 404-05.) Dr. Ehtesham reported that Cooke had a normal gait; his hygiene and grooming were fair; he had intermittent eye contact; his speech was spontaneous; he had normal motor activity; he had a euthymic affect with a congruent mood; his insight and judgment were fair; his reality testing was impaired; and his thought process was goal-oriented. (R. at 405.) She diagnosed panic disorder without agoraphobia. (R. at 405.) On October 20, 2015, Dr. Ehtesham reported that Cooke had a normal gait; his hygiene and grooming were fair; he had intermittent eye contact; his speech was spontaneous; he had normal motor activity; he had a euthymic affect with a congruent mood; his insight and judgment were fair; his reality testing was impaired; and his thought process was goal-oriented. (R. at 402.) Dr. Ehtesham diagnosed bipolar I disorder. (R. at 402.)

In October and November 2015, Cooke saw Dr. Kumar for complaints of back and knee pain, anxiety and depression. (R. at 409, 411.) Dr. Kumar noted stress reduction as part of Cooke's treatment plan. (R. at 410, 412.)

On November 16, 2015, Cooke was seen by Crystal Burke, L.C.S.W., a

licensed clinical social worker for Appalachia Family Health. (R. at 554-56.) Cooke reported marital and family stressors. (R. at 554.) He stated that he was very depressed, withdrawn and anxious as a result of his health issues and stress. (R. at 554.) Cooke also reported anger issues. (R. at 554.) Cooke's hygiene and grooming were fair; he was alert and oriented; his mood was depressed; he was tearful throughout the interview; he had a dysphoric affect; he had adequate eye contact; his thought content appeared depressed; he had intact thought process; and his judgment and insight were fair. (R. at 554-55.) Burke diagnosed major depressive disorder, single episode, severe without psychotic features, and generalized anxiety disorder. (R. at 555.)

On December 23, 2015, Dr. Ehtesham completed a mental assessment, indicating that Cooke had a satisfactory ability to follow work rules; to relate to co-workers; to use judgment in public; to function independently; to understand, remember and carry out complex job instructions; to maintain personal appearance; to relate predictably in social situations; and to demonstrate reliability. (R. at 454-56.) She found that Cooke had a seriously limited ability to deal with the public; to interact with supervisors; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out detailed and simple job instructions; and to behave in an emotionally stable manner. (R. at 454-55.) Dr. Ehtesham opined that Cooke could manage his own benefits and that he would be absent from work more than two days a month. (R. at 456.)

Cooke next saw Burke on January 26, 2016. (R. at 550-52.) He reported significant conflict with his wife and her daughter, which resulted in a verbal altercation for which he was arrested. (R. at 550.) Cooke stated that he was going to counseling with his wife, and he was working on "cutting out his alcohol." (R. at 550.) He stated that he was consuming up to six beers three times a week. (R. at

550.) Cooke reported that he remained depressed and was avoidant of public places and situations. (R. at 550.) Cooke's mood was depressed with a congruent affect; he had adequate eye contact; he had intact thought process; and his judgment and insight were fair. (R. at 552.) Burke diagnosed major depressive disorder, single episode, severe without psychotic features, and generalized anxiety disorder. (R. at 551.)

On April 25, 2016, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a PRTF, indicating that Cooke suffered from a nonsevere anxiety disorder. (R. at 71-72.) She found that Cooke had mild restrictions on his activities of daily living; mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and he had experienced no repeated episodes of extended-duration decompensation. (R. at 71.)

On August 24, 2016, Emily Scott, F.N.P., a family nurse practitioner with Park Avenue Medical Associates, saw Cooke for complaints of back and knee pain, left leg pain with numbness and anxiety. (R. at 475-76.) Upon examination, Cooke's lungs were clear; he had normal curvature of his back; he had low back tenderness; and he had full range of motion of his extremities with no deformities, edema or erythema. (R. at 476.) Scott diagnosed generalized anxiety disorder. (R. at 476.)

On August 22, 2017, Scott completed a mental assessment, indicating that Cooke had a slight limitation in his ability to follow work rules; to relate to co-workers; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 490-92.) She found that Cooke had a satisfactory ability to deal with the public; to use judgment in public; to interact with supervisors; to understand, remember and carry out complex and detailed job

instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. 490-91.) Scott found that Cooke could manage his own benefits and that he would be absent from work more than two days a month. (R. at 492.)

On October 12, 2017, Cooke saw Dr. Kumar for complaints of a rash on his back, low back pain, pain in his lower extremities, depression and anxiety. (R. at 586.) Cooke's examination showed paraspinal tenderness and spasm; his straight leg raising tests were positive on the left; he was in no acute distress; and his speech was normal. (R. at 587.) Dr. Kumar diagnosed degeneration of lumbar or lumbosacral intervertebral disc, hypertension, dermatitis and anxiety state, unspecified. (R. at 587-88.) Dr. Kumar reported that Cooke was able to perform his activities of daily living as his pain was controlled. (R. at 588.) Dr. Kumar noted stress management as part of Cooke's treatment plan and prescribed Cymbalta. (R. at 588.)

On October 22, 2017, Dr. Kumar completed a mental assessment, indicating that Cooke had no limitations on his ability to maintain personal appearance. (R. at 559-61.) He found that Cooke had a satisfactory ability to function independently; to understand, remember and carry out detailed and simple job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 559-60.) Dr. Kumar opined that Cooke had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to maintain attention and concentration; to understand, remember and carry out complex job instructions; and to demonstrate reliability. (R. at 559-60.) He also found that Cooke had no useful ability to deal with work stresses. (R. at 559.) Dr. Kumar reported that Cooke could manage benefits in his own interests and that he would be absent

from work more than two days a month. (R. at 561.)

On November 13, 2017, Cooke saw Dr. Kumar for complaints of neck and back pain, depression and anxiety. (R. at 590-97.) Cooke's examination showed paraspinal tenderness and spasm; his straight leg raising tests were positive on the left; he was in no acute distress; and his speech was normal. (R. at 596.) Dr. Kumar diagnosed cervical degenerative disc disease; degeneration of lumbar or lumbosacral intervertebral disc; hypertension; and anxiety state, unspecified. (R. at 596.) Dr. Kumar reported that Cooke was able to perform his activities of daily living as his pain was controlled. (R. at 596.) Dr. Kumar noted stress management as part of Cooke's treatment plan. (R. at 596.)

On November 16, 2017, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Cooke. (R. at 569-76.) Cooke reported anger issues, a depressed mood, a tendency to isolate, impaired concentration and decision-making ability and that he was frequently agitated and "stressed out." (R. at 571.) Fields reported that Cooke was pleasant and cooperative; he had adequate eye contact; he spontaneously generated conversation in a relevant and coherent fashion; his mood was depressed; he was anxious and displayed hand tremors; his affect was restricted; his stream of thought was organized and logical; he displayed no evidence of a thought content impairment; his judgment was adequate; his immediate memory was normal; his recent and remote memory were impaired; his concentration was impaired; and his pace was slow. (R. at 572-73.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Cooke obtained a full-scale IQ score of 75. (R. at 573-74.) The Beck Depression Inventory, ("BDI"), revealed that Cooke suffered from severe depressive symptomatology. (R. at 574.) The Beck Anxiety Inventory, ("BAI"), revealed that Cooke suffered from severe anxiety-related symptoms. (R. at 575.) Fields diagnosed bipolar I disorder, current

or most recent episode depressed; generalized anxiety disorder; panic disorder; and borderline intellectual functioning. (R. at 575.)

On December 4, 2017, Fields completed a mental assessment, indicating that Cooke had no limitations on his ability to maintain personal appearance. (R. at 577-79.) She found that Cooke had a satisfactory ability to follow work rules; to function independently; and to understand, remember and carry out simple instructions. (R. at 577-78.) Fields opined that Cooke had a seriously limited ability to relate to co-workers; to deal with the public; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 577-78.) She also found that Cooke had a satisfactory to seriously limited ability to interact with supervisors. (R. at 577.) Fields reported that Cooke could manage benefits in his own interests and that he would be absent from work more than two days a month. (R. at 579.)

On December 14, 2017, Cooke saw Dr. Kumar for complaints of neck and back pain, depression and anxiety. (R. at 598-605.) Dr. Kumar diagnosed anxiety state, unspecified. (R. at 604.) Dr. Kumar reported that Cooke was able to perform his activities of daily living as his pain was controlled. (R. at 604.) Dr. Kumar noted stress management as part of Cooke's treatment plan. (R. at 604.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Cooke argues that the ALJ erred by improperly determining his residual

functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) Cooke argues that the ALJ erred by failing to find that he suffered from a severe impairment. (Plaintiff's Brief at 5-6.) Cooke also argues that the ALJ erred by rejecting the opinions of Drs. Kumar and Ehtesham, Scott and Fields, and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Brief at 6-8.) Cooke contends that the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 7.)

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a) (2019). Basic work-related mental activities include understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1522(b) (2019). Although the Social Security regulations do not define the term "significant," this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." 581 F. Supp. at 159.

In evaluating the severity of mental impairments, the ALJ must first determine the degree of functional loss in four areas considered essential to the ability to work: (1) understanding, remembering or applying information; (2) interacting with others; (3) the ability to concentrate, persist or maintain pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (2019). These areas are rated on the following five-point scale: none, mild, moderate, marked and

extreme. *See* 20 C.F.R. § 404.1520a(c)(4) (2019). The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *See* 20 C.F.R. § 404.1520a(c)(4). If a claimant's degree of limitation in all of these areas is rated as "none" or "mild," the Commissioner generally will find that the claimant's impairment is not "severe" unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. *See* 20 C.F.R. § 404.1520a(d)(1) (2019). Here, the ALJ found that Cooke had mild limitations in all four areas. (R. at 15-16.)

The ALJ found that Cooke had "mild limitations" in the area of understanding, remembering and applying information. (R. at 15.) This category considers a claimant's ability to learn, recall and use information to perform work activities. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.1 (2019). Examples include understanding and learning terms, instructions and procedures, following one- to two-step oral instructions, describing work activity to someone else, recognizing a mistake and correcting it, identifying and solving problems, sequencing multi-step activities and using reason and judgment to make work-related decisions. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.1. In making this finding, the ALJ cited Fields's November 2017 evaluation, noting that Cooke's recent and remote recall were impaired and that he had a full-scale IQ score of 75, which placed him in the borderline range. (R. at 15, 573-74.) The ALJ noted that, although Cooke related difficulty retaining and comprehending information, he was able to obtain his driver's license and commercial driver's license without assistance. (R. at 15.) Therefore, the ALJ found that Cooke had mild limitations in this area. (R. at 15.)

The ALJ found that Cooke had "mild limitations" in the area of interacting with others, which refers to a claimant's capacity to relate to and work with

supervisors, co-workers and the public. (R. at 15.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.2. Examples of interacting with others include cooperating with others, asking for help when needed, handling conflicts, stating own point of view, initiating or sustaining conversation, understanding and responding to social cues, responding to requests, suggestions, criticism, correction or challenges and keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.2 (2019). The ALJ noted that Cooke had been married to his current wife for over seven years, but Cooke reported that their relationship was impacted by his temper. (R. at 15, 572.) The ALJ further noted that, during his November 2017 evaluation, Cooke was pleasant and cooperative, offered adequate eye contact, and he spontaneously generated conversation in a relevant and coherent fashion. (R. at 15.) Thus, the ALJ found that Cooke had mild limitations in this area. (R. at 15.)

The ALJ found that Cooke had "mild limitations" in the area of concentrating, persisting or maintaining pace, which refers to the ability to focus attention on work activities and stay on task at a sustained rate. (R. at 16.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.3 (2019). Examples include initiating and performing a work task, working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring distractions, changing activities without being disruptive, working close to or with others without interrupting or distracting them and sustaining an ordinary routine and regular attendance at work, as well as the ability to work a full day without needing more than the allotted number or length of rest periods customarily provided. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.3. The ALJ noted that, at his November 2017 evaluation, Cooke reported impaired concentration and decision-making abilities and that he also endorsed frequent worry and tendency to ruminate. (R. at 16, 571.) Upon examination, Cooke's stream of thought appeared organized and logical;

there was no evidence of a thought content impairment or perceptual disturbances; and his concentration appeared impaired. (R. at 16, 573.) Therefore, the ALJ determined that Cooke had mild limitations in this area. (R. at 16.)

The ALJ also found that Cooke had "mild limitations" in the area of adapting or managing oneself, which refers to the ability to regulate emotions, control behavior and maintain well-being in a work setting. (R. at 16.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.4 (2019). This includes the ability to respond to demands, adapt to changes, manage psychologically based symptoms, distinguish between acceptable and unacceptable work performance, set realistic goals, make plans independently of others, maintain personal hygiene and attire and to be aware of normal hazards and to take precautions. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.4. The ALJ noted that Cooke received medication management from Dr. Ehtesham, but he reported an inability to tolerate the medication. (R. at 16.) The ALJ also noted that progress notes from Dr. Kumar indicated that Cooke was able to perform his activities of daily living. (R. at 16.) Thus, the ALJ determined that Cooke had mild limitations in this area. (R. at 16.)

In making these findings, the ALJ stated that he was giving "partial weight" to Dr. Kumar's mental assessments because they were "more restrictive than warranted by the record" and because they were inconsistent with Cooke's mental health treatment throughout the alleged period of disability. (R. at 18-19.) The ALJ also stated that he was giving "little weight" to Dr. Ehtesham' assessment, stating that it was inconsistent with Cooke's "abbreviated treatment history," as well as Dr. Ehtesham's own examination findings. (R. at 19.) In addition, the ALJ stated that he was giving Fields's assessment "little weight" because it was inconsistent with Fields's own clinical findings, which indicated that Cooke had a pleasant and engaged demeanor, full orientation, relevant and coherent conversation, organized

-17-

and logical stream of thought, adequate judgment and adequate immediate memory. (R. at 19, 572-73.)

The ALJ stated that the was giving the state agency consultants' assessments "great weight." (R. at 19.) The ALJ noted that the state agency consultants' opinions "acknowledge the essentially intact mental status examinations of record in addition to [Cooke's] lack of consistent treatment from a mental health specialist." (R. at 20.) The ALJ found that their opinions were supported by the objective medical findings and were consistent with the substantial evidence of record. (R. at 20.) The state agency psychologists opined that Cooke did not have a severe mental impairment. (R. at 59-60, 71-72.) It is noted that these assessments were rendered prior to Fields's November 2017 evaluation.

Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's finding that Cooke did not suffer from a severe mental impairment. In determining that Cooke had mild limitations in the area of understanding, remembering and applying information, the ALJ noted that Cooke's recent and remote memory were impaired, that he had a limited education and that he had a full-scale IQ score of 75. (R. at 15, 32, 573-74.) The record also shows that Cooke's ability to concentrate was impaired and that his pace was slow. (R. at 573.) Dr. Kumar and Fields both opined that Cooke had a seriously limited ability to understand, remember and carry out both complex and detailed job instructions. (R. at 387, 560, 578.) Dr. Kumar also opined that Cooke had a seriously limited ability to use judgment in public. (R. at 559.)  In addition, Dr. Ehtesham opined that Cooke had a seriously limited ability to understand, remember and carry out detailed and simple job instructions. (R. at 455.) While the ALJ mentioned that the record showed that Cooke appeared to have impaired concentration, he did not mention that Fields also found Cooke to have a slow pace. (R. at 16, 573.) In

addition, while the ALJ noted that Cooke's recent and remote memory were impaired and that he had a full-scale IQ score of 75, he failed to determine what effect that would have on Cooke's work-related abilities.

In determining that Cooke had mild limitations in his ability to interact with others, the ALJ noted that Cooke had been married to his current wife for over seven years, but Cooke reported that their relationship was impacted by his temper. (R. at 15, 572.) It is noted that the record shows that Cooke reported that he was arrested after a verbal altercation with his wife and her daughter and that he had reported problems with anger issues to Burke and Fields. (R. at 550, 554, 571-72.) Dr. Kumar, Dr. Ehtesham and Fields all opined that Cooke was seriously limited in his ability to relate to co-workers, to deal with the public, to interact with supervisors and to behave predictably in social situations. (R. at 386-87, 454-55, 559-60, 577-78.) The ALJ did not address how Cooke's anger problems would affect his work-related abilities.

In determining that Cooke had mild limitations in his ability to concentrate, persist or maintain pace, the ALJ noted that Cooke reported impaired concentration and decision-making abilities and that he also endorsed frequent worry and tendency to ruminate. (R. at 16, 571.) The record shows that Cooke's judgment and insight were deemed fair; his reality testing was impaired; he had impaired concentration; and a slow pace. (R. at 402, 405, 408, 552, 554-55, 572-73.) In 2015 and 2017, Dr. Kumar opined that Cooke had either a seriously limited or no useful ability to maintain attention and concentration. (R. at 386, 559.) Likewise, in 2015 and 2017, Dr. Ehtesham and Fields opined that Cooke had a seriously limited ability to maintain attention and concentration. (R. at 454, 577.)

In determining that Cooke had mild limitations in the area of adapting or managing oneself, the ALJ noted that Cooke received medication management from Dr. Ehtesham, but he reported an inability to tolerate the medication. (R. at 16.) The ALJ also noted that progress notes from Dr. Kumar indicated that Cooke was able to perform his activities of daily living. (R. at 16.) The record shows that both Dr. Ehtesham and Burke reported on various occasions that Cooke's hygiene and grooming were fair. (R. at 402, 405, 408, 554.) Dr. Ehtesham and Fields opined that Cooke had a seriously limited ability to behave in an emotionally stable manner. (R. at 455, 578.) Dr. Kumar found that Cooke had a seriously limited ability to use judgment in public and to demonstrate reliability. (R. at 559-60.) Fields also opined that Cooke had a seriously limited ability to demonstrate reliability. (R. at 578.)

In making his findings, the ALJ stated that he was giving "partial weight" to Dr. Kumar's mental assessments because they were "more restrictive than warranted by the record" and because they were inconsistent with Cooke's mental health treatment throughout the alleged period of disability. (R. at 18-19.) The ALJ also stated that he was giving "little weight" to Dr. Ehtesham's assessment, stating that it was inconsistent with Cooke's "abbreviated treatment history," as well as Dr. Ehtesham's own examination findings. (R. at 19.) In addition, the ALJ stated that he was giving Fields's assessment "little weight" because it was inconsistent with Fields's own clinical findings, which indicated that Cooke had a pleasant and engaged demeanor, full orientation, relevant and coherent conversation, organized and logical stream of thought, adequate judgment and adequate immediate memory. (R. at 19, 572-73.) The court notes that Fields administered the BDI and BAI, which revealed that Cooke suffered from severe depression and anxiety-related symptoms. (R. at 574-75.) She also administered the WAIS-IV, which showed that Cooke's full-scale IQ score was 75. (R. at 574.) Based on her review

of Cooke's medical records, instrument endorsement and reported symptoms, Fields opined that Cooke had mood-related symptoms consistent with bipolar disorder, generalized anxiety and panic attacks. (R. at 575.) She stated that she based her findings concerning Cooke's abilities to perform occupational, performance and personal/social skills on his mood-related bipolar symptoms, impaired concentration and borderline intellectual functioning. (R. at 577-79.)

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In this case, the ALJ's opinion referenced certain impairments; however, he failed to determine what, if any, impact these impairments would have on Cooke's work-related abilities. Thus, I do not find that substantial evidence exists to support the ALJ's finding regarding Cooke's mental residual functional capacity. Based on these findings, I will not address Cooke's remaining arguments. An appropriate Order and Judgment will be entered remanding Cooke's claim to the

Commissioner for further development.

DATED:    July 29, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE